Filed 3/30/17

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| BANNING RANCH CONSERVANCY, | ) | |
| | ) | |
| Plaintiff and Appellant, | ) | |
| | ) | S227473 |
| v. | ) | |
| | ) | Ct.App. 4/3 G049691 |
| CITY OF NEWPORT BEACH et al., | ) | |
| | ) | Orange County |
| Defendants and Appellants; | ) | Super. Ct. No. 30-2012-00593557 |
| | ) | |
| NEWPORT BANNING RANCH LLC et al., | ) | |
| | ) | |
| Real Parties in Interest and | ) | |
| Appellants. | ) | |
| _____ | ) | |

The City of Newport Beach (the City) approved a project for the development of a parcel known as Banning Ranch. Banning Ranch Conservancy (BRC) opposed the project and sought a writ of mandate to set aside the approval. It alleged two grounds for relief: (1) the environmental impact report (EIR) was inadequate, and (2) the City violated a general plan provision by failing to work with the California Coastal Commission (Coastal Commission) to identify wetlands and habitats. The trial court found the EIR sufficient, but granted BRC relief on the ground that the general plan required the City to cooperate with the Coastal Commission before approving the project.

1

The Court of Appeal agreed that the EIR complied with the requirements of the California Environmental Quality Act (CEQA).[1] However, it reversed on the general plan issue, accepting the City's argument that the plan would be satisfied if the City worked with the commission after project approval, during the process for obtaining a coastal development permit.

In this court, the parties have briefed and argued both the general plan and CEQA questions. The CEQA dispute centers on whether an EIR must identify areas that might qualify as environmentally sensitive habitat areas (ESHA) under the California Coastal Act of 1976 (Coastal Act; § 30000 et seq.), and account for those areas in its analysis of project alternatives and mitigation measures. We hold that CEQA so requires. The City's EIR is inadequate because it omitted any consideration of potential ESHA on the project site, as well as ESHA that were already identified. Because BRC is entitled to relief on its CEQA claims, we need not address the general plan issues.

## I. BACKGROUND

A. *Banning Ranch, the General Plan, the Coastal Land Use Plan, and ESHA*

Banning Ranch is a privately owned 400-acre tract of largely undeveloped property, containing both oilfield facilities and wildlife habitat. Significantly, it lies in the coastal zone that the Legislature has designated for special protection under the Coastal Act. (§ 30001.5.) Most development in the coastal zone requires a coastal development permit. (§ 30600.)

Although most of Banning Ranch is in unincorporated Orange County, all of it falls within the City's "sphere of influence" for zoning and planning purposes. (See Gov. Code, § 56425 et seq.) The City's general plan sets out two

---

[1] Public Resources Code, section 21000 et seq. Unless otherwise noted, further statutory references are to the Public Resources Code.

2

alternative goals for the area. The preferred option is community open space, with development limited to nature education facilities and a park. The second alternative would allow construction of up to 1,375 residential units, 75,000 square feet of retail facilities, and 75 hotel rooms. As to both alternatives, the plan calls for consolidating the oil operations and restoring wetlands and wildlife habitats. A general plan "strategy" titled "Coordination with State and Federal Agencies" requires the City to "[w]ork with appropriate state and federal agencies to identify wetlands and habitats to be preserved and/or restored and those on which development will be permitted." (City of Newport Beach, General Plan (July 2006) ch. 3, Land Use Element, p. 3-76.)

In addition to having a general plan, every local government in the coastal zone must submit a local coastal program for Coastal Commission approval. The program consists of a coastal land use plan (CLUP) and implementing regulations. The CLUP may be completed first, with regulations developed later. (*Yost v. Thomas* (1984) 36 Cal.3d 561, 566; § 30500.) The City had yet to enact its regulatory component, or to adopt procedures for issuing coastal development permits, and thus did not have a certified local coastal program. (See § 30600, subd. (b)(1).) Accordingly, the Coastal Commission exercised permitting authority over development on Banning Ranch. (See § 30600, subd. (c).)

The City did have a certified CLUP, but chose to exclude Banning Ranch from its scope. The general plan explains that "Banning Ranch is a Deferred Certification Area . . . due to unresolved issues related to land use, public access, and the protection of coastal resources." (City of Newport Beach, General Plan, *supra*, ch. 13, Implementation Program, p. 13-8.) The CLUP defines ESHA in the same terms as section 30107.5 of the Coastal Act: "any area in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem . . . which could be easily disturbed or

3

degraded by human activities and developments" is an environmentally sensitive habitat area. (City of Newport Beach, Local Coastal Program (Dec. 13, 2005) Coastal Land Use Plan, 4.1.1, p. 4-1.) The CLUP sets out criteria for identifying ESHA and establishes a presumption, rebuttable by "site-specific evidence," that areas meeting those criteria are ESHA.

The Coastal Act specifies that "[e]nvironmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas." (§ 30240, subd. (a).) "Development in areas adjacent to environmentally sensitive habitat areas . . . shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat . . . areas." (§ 30240, subd. (b).)

B. *The Proposed Development and the Early Identification of ESHA*

The City was unable to raise the funds to buy Banning Ranch for open space. In August 2008 Newport Banning Ranch LLC (NBR) submitted a proposal for a residential and commercial village reaching the maximum levels of development permitted by the general plan. At the City's request, the proposal included a report on "the extensive field survey work" by NBR's biological consultant "on potential special status habitats (potential ESHA)." The proposal explained that the project was designed to avoid all areas of ESHA as defined by the CLUP, with one exception. A major access road would have unavoidable impacts on 0.06 acre of potential scrub ESHA and 0.02 acre of potential riparian ESHA. These impacts would be fully mitigated. A map included in the biological report showed numerous potential ESHA throughout Banning Ranch.

The City was not satisfied with NBR's proposed road network. Banning Ranch is bordered by the Santa Ana River and other wetland areas to the west, and by 19th Street to the north. (For a map of the area, with the roadway plan

4

ultimately approved by the City, see appen. A.) West Coast Highway, which runs along the coastline, forms the southern boundary. The eastern boundary is intersected or approached by 15th, 16th, 17th, and 18th Streets. The southeastern corner of the site is bordered by Sunset Ridge Park, a separate City project that was in progress at the time of NBR's proposal. NBR's plans called for a new "Bluff Road," running north from the highway and curving east to meet 15th Street, with another segment extending northward. The Orange County master plan of arterial highways (MPAH) envisioned Bluff Road as a six-lane divided road running north and south through the eastern portion of Banning Ranch, connecting 19th Street with the highway. However, NBR proposed to omit the segment between 19th and 17th streets in order to limit ESHA impacts. It contemplated amending the MPAH to reflect this change.

The mayor and city council wanted Bluff Road to run all the way to 19th Street. NBR submitted a revised plan, saying it would accommodate the "road circulation network requested by the City of Newport Beach as a public benefit." NBR's biological consultant pointed out that the changes "would significantly impact scrub, wetlands, and riparian habitat that would be considered [ESHA] pursuant to the City's [CLUP] as well as the California Coastal Act . . . . It is important to note that impacts to ESHA are prohibited [by the] California Coastal Act except for certain allowable uses, and the proposed connectors would be problematic to the California Coastal Commission."

Under CEQA, the "lead agency" is "the public agency which has the principal responsibility for carrying out or approving a project." (§ 21067.) As lead agency for the NBR project, the City was responsible for preparing an EIR. (See § 21100, subd. (a).) The process entails circulation of a notice of preparation, followed by draft and final EIRs. The public may submit comments on the notice

5

of preparation and the draft EIR.  (Cal. Code Regs., tit. 14, §§ 15082, 15087, 15089.)[2]

The City retained its own environmental consultant.  In March 2009, it gave notice that it would prepare a draft EIR for the Banning Ranch project.  The notice stated that the project "includes areas that may be defined and regulated under the California Coastal Act . . . as either wetlands or environmentally sensitive habitat areas (ESHAs)."  The notice also explained that because the City did not have a certified local coastal program, it could not issue coastal development permits for the project.  If the City approved the project plans, NBR would apply for a coastal development permit from the Coastal Commission.

A number of public comments on the notice mentioned the need to identify ESHA in the EIR.  The City of Costa Mesa suggested that "[g]iven the significance of the project site, the EIR should consider the Coastal Commission thresholds for impacts to wild life and endangered species."  A consultant and a board member for BRC, the group that eventually brought this lawsuit, also urged the City to use Coastal Commission standards to assess ESHA on the site.  Another BRC member commented that the proposed Bluff Road extension crossed ESHA, and would not be approved by the commission.

In April 2009, Coastal Commission staff learned that vegetation had been cleared from three areas on Banning Ranch without a coastal development permit.  Investigation disclosed that NBR had leased portions of its property to a contractor doing utility work.  The contractor cleared the areas and used them for parking and storage.  In September and December 2010, the City and NBR representatives visited the sites with a Coastal Commission ecologist to determine the extent of

---

**2**     Subsequent references to "Guidelines" are to the CEQA guidelines found in title 14 of the California Code of Regulations, section 15000 et seq.

6

the unpermitted activity and its impacts. The ecologist decided that two cleared areas, one on Banning Ranch and one straddling the boundary between the ranch and City property, met the definition of ESHA.[3] The City and NBR disputed that determination and submitted documents supporting their view. Ultimately, however, they chose not to contest the ESHA findings.

The parties formalized a stipulation that commission staff's ESHA findings would be determinative only as to the two areas at issue, and that the commission would undertake a separate analysis of other areas in any future proceedings. The City and NBR noted their disagreement with the findings and retained the right to present evidence on whether other areas were ESHA. The commission adopted the staff findings, which included a determination that the unpermitted activity was inconsistent with policies in the City's CLUP.[4] It issued consent orders requiring the City and NBR to restore the damaged sites.

---

[3] The ecologist prepared a memorandum describing the December 2010 site visit. She noted that the parties had discussed "our approach to making an ESHA determination." The memorandum refers to the map of potential ESHA on Banning Ranch that was part of the biological report accompanying NBR's original project proposal. It observes that the biological report "was posted on the City of Newport Beach website and downloaded in August 2009; it has since been removed. . . . Given that the vegetation . . . and ESHA . . . exhibits portray the expert opinion of [NBR's consultant] at the time they were developed, we believe it is appropriate to consider this information, along with other sources, in our ESHA determination. We note that these data support our ESHA conclusions . . . ."

[4] Staff noted that until the City obtained certification of its local coastal program, Coastal Act standards governed permitting and enforcement. However, "because the City's CLUP has been certified and Banning Ranch is within the City's sphere of influence, it serves as a valuable guidance document in such matters." The report quotes at length from the CLUP's provisions regarding ESHA.

In March 2011, shortly before the consent orders were finalized, City and NBR representatives met with Coastal Commission staff to talk about Banning Ranch. Topics included attempts by commission staff to visit the project site, and the fact that there had been "no recent contacts with [commission] staff." Several months later the City's planning manager e-mailed the NBR project manager, asking what revisions would be made as a result of the commission's designation of ESHA on the site. The NBR manager responded, "No revisions. We will have to fight for our project — just as the City will for its park — but it can be built as proposed after re-vegetating the two [areas] (which are in areas already designated for open space) and providing the mitigation (again which is areas already designated for open space — most of which is in the open space at the north of the property). [¶] In short — the [Coastal Commission] agreement will not affect the [draft] EIR."

The reference to the City's park was to Sunset Ridge Park, the separate project bordering Banning Ranch to the southeast. The final EIR for the park project had been certified a year earlier. (See *Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1219 (*Banning Ranch I*).) The Sunset Ridge Park EIR designated no area of the park as ESHA under the City's CLUP, but acknowledged that two areas might be considered ESHA by the Coastal Commission. (*Id*. at pp. 1233-1234.) The proposed public access to the park was a road over Banning Ranch, the size and location of which became a significant issue.

C. *The Park Road Dispute*

Commission staff issued a report in October 2011 recommending that a coastal development permit be denied for Sunset Ridge Park. The report explained that the City sought access to its park through Banning Ranch under an agreement with NBR. The proposed access road crossed ESHA that were

8

occupied by the endangered California gnatcatcher. After working with the City and considering several alternatives, staff had identified a route that would avoid direct impacts on gnatcatcher habitat. Staff was prepared to recommend approval of this alignment if the road was restricted to two lanes with limited daily usage and gnatcatcher habitat was created on each side, with some other habitat improvements.

The City and NBR would not agree to these conditions. The draft EIR for the Banning Ranch project, which had just circulated, proposed widening the road to four lanes. It would serve both the park and the NBR development, becoming a major arterial road used by thousands of vehicles a day. Commission staff observed that such a road would directly affect the ESHA already identified, and others that were likely to be determined. The staff report concluded:

"To summarize, staff has been working earnestly with the City to identify a [park] project that could be approved pursuant to modifications and special conditions to bring it into compliance with the Coastal Act. However, after further review, and after further communication with the City and with [NBR], it has become clear that they cannot address the threshold issue of foreclosing future expansion of the park access road, so that ESHA, buffers, and the California gnatcatcher that relies on them, are permanently protected . . . . Compromises on the widths and kinds of uses within buffers would also be required, that could only be offset by revegetating the buffers with [plants] suitable for use by gnatcatchers, and permanently preserving those areas. Certain issues remain unresolved related to vernal pools and the legality of mowing habitat that would otherwise be ESHA. Therefore, in our final analysis based on the information now before us, staff determined that the proposed [park] project is not consistent with the Coastal Act, and the proposed project must be denied. If the City and [NBR] anticipate a larger road . . . to serve future development on the Banning Ranch property, all impacts

9

associated with a road in this location should be reviewed in the context of the larger development it will ultimately serve.  Approval of a smaller road and its associated impacts is premature at this time." (Cal. Coastal Com., Staff Rep. on application No. 5-10-168 (Oct. 20, 2011) pp. 6-7.)

In a responding letter, the City claimed it had no legal authority to revegetate the roadside areas, which would "create a new resource" instead of providing a buffer.  The letter said "it continues to be the position of the City that its proposed park access road is not a precursor for future [NBR development]." However, the City acknowledged that the proposed arterial road for the Banning Ranch project was "double the size of the park road," and that the park road was "located with aforethought in the approximate location" of the arterial road.  The City protested the restrictions on the park access road as a "preemptive strike on future development" that was beyond the scope of the Coastal Commission's permitting authority.  It noted that foreclosing the construction of an arterial road on Banning Ranch would conflict with the circulation element of the City's general plan, the County's master plan, and countywide transportation funding requirements.

D.  *The Draft EIR and Public Comments*

The City circulated a draft EIR for the Banning Ranch project in September 2011.  The document explained that while the City could not issue coastal development permits, it did "review[] pending development projects for consistency with the General Plan, Zoning regulations, and the CLUP" before applicants sought coastal development permits from the Coastal Commission.  The draft EIR did not identify potential ESHA or discuss the subject in any substantive detail.  It noted in various places that the project would require a permit from the commission, which would determine whether Banning Ranch contained ESHA.

10

The City acknowledged that in doing so, the commission would take guidance from the CLUP.

Many comments on the Banning Ranch draft EIR complained about the omission of an ESHA analysis. One comment asserted that the avoidance of any ESHA determination was "egregious" because both NBR and the City *knew* there were ESHA on Banning Ranch because of the Coastal Commission consent orders. A consultant retained by BRC claimed that while the draft EIR did not include a map of probable ESHA, a computer search would reveal "numerous wetland polygons . . . indicating the EIR preparer's opinion regarding the limits of wetland ESHA on the project site; many of these areas are proposed for permanent impacts, which is inconsistent with the Coastal Act." Another comment referred to a hearing on the park access road, from which "it appears that the Coastal Commission has identified ESHA at Banning Ranch where the City had not. Habitat mapping [in the EIR] must be revised to reflect [the] observations and the standards of the Coastal Commission."

The Coastal Commission submitted 15 pages of staff comments, noting they "should not be construed as representing the opinion of the Coastal Commission itself." Staff said the City's CLUP provided "strong guidance" even though no local coastal program was in place. They suggested the EIR address whether the proposed development was consistent with policies in both the CLUP and the Coastal Act. Several comments pertained to ESHA.

Commission staff pointed out that under the Coastal Act, development must avoid impacts to ESHA. They said section 30240 does not permit "non-resource dependent impacts to an ESHA area," even if there is mitigation in other areas. "Rather, Section 30240 requires that proposed new development be located outside of ESHA areas. Additionally, Section 30240 requires siting, design, and appropriate buffers to ensure that development adjacent to ESHA does not result

11

in" ESHA impacts. Staff recommended that the EIR use the CLUP to evaluate sensitive habitat areas and appropriate buffer zones. "[I]t is important that the EIR process incorporate a determination of probable ESHA areas and their required buffers before land use areas and development footprints are established." Staff proposed that ESHA, wetland, and buffer zone delineations be reviewed by commission biologists before the EIR was finalized.

Based on a "preliminary analysis," commission staff found that the proposed Banning Ranch development was inconsistent with the ESHA requirements of the Coastal Act, particularly the four-lane portion of Bluff Road connecting with West Coast Highway. They urged that the EIR "more fully consider alternative intensities of development on the site and alternative means to access the property," because any access road from West Coast Highway would likely be found inconsistent with the Coastal Act. The comment added that some grading and placement of structures appeared to infringe on sensitive areas mapped in the draft EIR, and "[o]nce more fully mapped as recommended herein, the quantity of sensitive habitat areas may be even more extensive. In any event, it's clear that the proposed development would result in the elimination of habitat supporting sensitive species." Staff suggested the City evaluate alternatives to avoid these impacts.

E. *The Final EIR*

In the final EIR, the City responded to comments but did not change its position on ESHA determinations. Regarding the Coastal Commission consent orders, the City said the agreed-upon restoration plan was being implemented. It acknowledged that the commission had identified two ESHA on the project site. However, it said the commission "has not made an ESHA determination for the remainder of the . . . site, and no conclusions of ESHA can and will be made by the City at this time as part of the EIR process that would in any way bind the

12

Coastal Commission or elucidate on the Coastal Commission's ultimate conclusions [*sic*]. Rather, as appropriate under CEQA, the City has analyzed the impacts of the project, and concluded that they can be reduced to a less-than-significant level or avoided with appropriate measures. As stated in the Consent Orders, a separate analysis will be undertaken by the Coastal Commission in connection with any future Coastal Development Permit application or proceeding before the Coastal Commission involving these properties."

In a general discussion of ESHA, the City emphasized that Sunset Ridge Park and the NBR development were separate projects, and that the park was beyond the scope of the Banning Ranch EIR. Although the Coastal Commission was responsible for ESHA determinations, the City had "taken into consideration . . . the policies of the Coastal Act in the Draft EIR and provide[d] a consistency analysis of the proposed Project and those policies." The City referred to a table in the draft EIR finding the project generally consistent with a list of Coastal Act provisions, but without any mention of ESHA. It recognized that "the proposed alignment of Bluff Road is within areas that were identified as ESHA by the Coastal Commission in the Consent Orders. The Coastal Commission has not reviewed the Newport Banning Ranch proposal and has not made any recommendations regarding Bluff Road at this time. The Coastal Commission has, however, reviewed the City's Sunset Ridge Park application which included a park access road in this same area and made recommendations on reconfiguring the entry road to minimize impacts to sensitive coastal resources in a manner that could be found consistent with the Coastal Act and Section 30240 in particular." The City did not mention that it had rejected those recommendations, saying only that it had later "revised its application for Sunset Ridge Park."

The City disavowed any obligation to further consider ESHA. It claimed it had "fulfilled its obligation under CEQA to analyze the significant impacts of a

13

project on the physical environment." It maintained that ESHA findings were "within the discretion of the Coastal Commission, or a local agency as part of its [local coastal plan] certification process. While the Draft EIR must identify a project's impact on the environment, including biological resources such as sensitive species and sensitive native vegetation, it is not required to make a finding pursuant to the Coastal Act. That would be within the discretion and authority of the Coastal Commission when this Project comes before them." The City noted that NBR would "apply for a Coastal Development Permit to implement its proposed Project. The Coastal Commission's comments regarding the level of detail required for a Coastal Development Permit will be forwarded to [NBR] for its consideration in preparing its application to the Coastal Commission."[5]

With regard to using the CLUP to analyze environmental impacts, the City noted Banning Ranch's status as a deferred certification area, and argued that "the policies in the City's CLUP are not applicable to the Banning Ranch property. . . . Because the City does not have a certified [local coastal plan], and the City's CLUP does not include the Banning Ranch property, the City acknowledges that any consideration of a Coastal Development Permit for the Project site would require a finding of consistency with the . . . policies of the Coastal Act."

---

[5] An e-mail from the City's planning manager to its environmental consultant, shortly before the final EIR was released, also indicates the City's expectation that NBR would shoulder the responsibility for meeting Coastal Commission requirements. When asked how much time and effort the consultant should spend preparing a response to anticipated commission staff comments on archaeological resources, the planning manager wrote: "Very little. After the EIR's certified, the work is done. It will be [NBR's] responsibility to get it through [the Coastal Commission]."

14

In response to commission staff's ESHA comments, the City stated: "The purpose of the Draft EIR is to analyze a proposed project's impact on the physical environment. It is not, in and of itself, a policy consistency analysis, except to the extent that such inconsistencies reveal environmental impacts that otherwise are not discussed. . . . [T]he Draft EIR analyzes the proposed Project's impact on biological resources, including federal and State listed endangered and threatened species, sensitive plant and animal species, and specific habitats such as wetlands and vernal pools. All impacts to these resources would be mitigated or avoided with the Mitigation Program . . . . The Draft EIR acknowledges that the Coastal Commission makes the determination as to whether any or all of these constitute ESHA under the Coastal Act, and application of the policies of the Coastal Act to the existing conditions on the Project site would be undertaken as part of the Coastal Commission's Coastal Development Permit process." The City did not directly respond to staff's concern about the identification of potential ESHA "before land use areas and development footprints are established." It did not respond at all to the suggestion that ESHA and buffer zone delineations be reviewed by commission staff before the EIR was finalized.

The City extensively addressed commission staff's comments on the Bluff Road access from West Coast Highway. It acknowledged that the staff recommendations prepared for the Sunset Ridge Park permit application included a finding that the proposed arterial road would be inconsistent with the Coastal Act. However, the City noted that no action had yet been taken on the Sunset Ridge Park application. It repeated that staff had indicated they would approve an access road from West Coast Highway under some circumstances. A new connection from 19th Street to the highway was a "fundamental goal" of the project, and the City had accepted funding from the county ("Measure M" funds) premised on the condition that it would complete that link. It found that

15

elimination of access from the highway would be "infeasible" in light of these constraints.

The City's response concluded: "Bluff Road through the property is reflected in the City's General Plan Circulation Element Master Plan of Streets and Highways and the Orange County MPAH. The City cannot eliminate this planned circulation improvement without amending its Circulation Element, and cannot unilaterally amend the County's MPAH. Further, eliminating Bluff Road would place the City in conflict with its obligations assumed in connection with its acceptance of Measure M funds. Finally, eliminating Bluff Road access from West Coast Highway would not substantially lessen impacts to biological resources and would eliminate an alternative means of coastal access."

F.  *Project Approval and the Litigation Below*

The City certified the final EIR in July 2012. It also approved NBR's master development plan, a development agreement, and zoning changes for Banning Ranch. BRC challenged the project approval by seeking a writ of mandate. It contended the EIR did not adequately disclose or analyze environmental impacts and mitigation measures with respect to ESHA, instead deferring these critical functions. BRC also alleged that the City had violated its obligation under the general plan to work with the Coastal Commission to identify areas on Banning Ranch to be protected from development.

The City responded that CEQA does not require an EIR to include ESHA determinations. It defended its exercise of discretion under the general plan. The trial court rejected the CEQA claims, relying on *Banning Ranch I*, *supra*, 211 Cal.App.4th 1209. In that case, the Court of Appeal held it was sufficient for the City's Sunset Ridge Park EIR to note potential ESHA and acknowledge that the Coastal Commission's designation of ESHA might lead it to reject proposed

16

mitigation measures. However, the trial court granted BRC's petition, finding that the City had failed to meet its obligations under the general plan.

The Court of Appeal reversed the grant of relief, concluding that the general plan did not require the City to work with the Coastal Commission before project approval. On the CEQA issue, the court agreed with the City that ESHA designations were a legal determination to be made by the Coastal Commission, and not a subject for consideration in the EIR. Like the trial court, the Court of Appeal found support in *Banning Ranch I*, *supra*, 211 Cal.App.4th at pages 1233-1234. It acknowledged that in *Banning Ranch I* the park *was* subject to the City's CLUP, and the City *did* identify potential ESHA in the EIR. However, it deemed these differences unimportant, finding it sufficient for the Banning Ranch EIR to note that the project was outside the scope of the CLUP and the Coastal Commission would determine whether ESHA would be affected. The court concluded, "CEQA does not require the City to prognosticate as to the likelihood of ESHA determinations and coastal development permit approval."

## II. DISCUSSION

### A. *Sufficiency of the EIR*

"[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence. (§ 21168.5.) Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564), we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,'

17

for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' (*Laurel Heights* [*Improvement Assn. v. Regents of University of California* (1988)] 47 Cal.3d [376,] 393." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard*).)

Whether an EIR has omitted essential information is a procedural question subject to de novo review. (*Vineyard*, *supra*, 40 Cal.4th at p. 435; *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236 (*Sierra Club*).) Here the principal issue is whether the Banning Ranch EIR was required to identify potential ESHA and analyze the impacts of the project on those areas. CEQA requires every EIR to identify "[a]ll significant effects on the environment of the proposed project," which would generally include effects on sensitive habitat areas. (§ 21100, subd. (b)(1); see Guidelines, § 15126.2.) ESHA, however, are "rare or especially valuable" habitat areas in the coastal zone, given enhanced protection by the Coastal Act. (§ 30107.5) They must be "protected against any significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas." (§ 30240, subd. (a).) Development adjacent to ESHA "shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat . . . areas." (§ 30240, subd. (b).)

The City argues that CEQA imposes no duty to consider the Coastal Act's ESHA requirements. It claims it was sufficient for the Banning Ranch EIR to analyze the impacts of the NBR project, including those on sensitive habitat areas, without accounting for potential ESHA. Essentially, the City claims it was entitled to ignore the fact that Banning Ranch is in the coastal zone. The City's position is untenable. CEQA sets out a fundamental policy requiring local agencies to "integrate the requirements of this division with planning and

18

environmental review procedures otherwise required by law or by local practice so that all those procedures, to the maximum feasible extent, run concurrently, rather than consecutively." (§ 21003, subd. (a).) The CEQA guidelines similarly specify that "[t]o the extent possible, the EIR process should be combined with the existing planning, review, and project approval process used by each public agency." (Guidelines, § 15080.)

An EIR project description must include "[a] list of related environmental review and consultation requirements [found in] federal, state, or local laws, regulations, or policies. *To the fullest extent possible, the lead agency should integrate CEQA review with these related environmental review and consultation requirements*." (Guidelines, § 15124, subd. (d)(1)(C), italics added; see also Guidelines, § 15006, subd. (i).) Toward that end, agencies are encouraged to "[c]onsult[] with state and local responsible agencies before and during preparation of an environmental impact report so that the document will meet the needs of all the agencies which will use it." (Guidelines, § 15006, subd. (g).) Here, the City ignored its obligation to integrate CEQA review with the requirements of the Coastal Act, and gave little consideration to the Coastal Commission's needs.

The Guidelines specifically call for consideration of related regulatory regimes, like the Coastal Act, when discussing project alternatives. An EIR must "describe a range of reasonable alternatives to the project," or to its location, that would "feasibly attain" most of its basic objectives but "avoid or substantially lessen" its significant effects. (Guidelines, § 15126.6, subd. (a).) Among the factors relevant to the feasibility analysis are "other plans or regulatory limitations, [and] jurisdictional boundaries (projects with a regionally significant impact should consider the regional context)." (*Id.*, subd. (f)(1).) By definition, projects with substantial impacts in the coastal zone are regionally significant.

19

(Guidelines, § 15206, subd. (b)(4)(C).)[6] Thus, the regulatory limitations imposed by the Coastal Act's ESHA provisions should have been central to the Banning Ranch EIR's analysis of feasible alternatives.

Evaluation of project alternatives and mitigation measures is "[t]he core of an EIR." (*Citizens of Goleta Valley v. Board of Supervisors*, *supra*, 52 Cal.3d at p. 564 (*Goleta Valley*).) "The purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (§ 21061; see § 21002.1, subd. (a).) CEQA procedures "are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects." (§ 21002; see Guidelines, §§ 15126.4, 15126.6.)

Decisions as to the feasibility of alternatives and mitigation measures are subject to a rule of reason. (*Goleta Valley*, *supra*, 52 Cal.3d at p. 565; *Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 47 Cal.3d at p. 407 (*Laurel Heights I*); see Guidelines, § 15126.6, subd. (f)(1).) No one factor establishes a categorical limit on the scope of reasonably feasible alternatives to be discussed in an EIR. (*Goleta Valley*, at p. 566; Guidelines, § 15126.6, subd. (f).) Here, however, the City's EIR omitted *any* analysis of the Coastal Act's ESHA requirements. It did not discuss which areas might qualify as

---

**6**  In general, an EIR must take "the regional setting" of a project into account, placing "[s]pecial emphasis . . . on environmental resources that are rare or unique to that region and would be affected . . . ." (Guidelines, § 15125, subd. (c).) "[T]he significant effects of the project [must] be considered in the full environmental context." (*Ibid*.)

ESHA, or consider impacts on the two ESHA delineated in the Coastal Commission's consent orders. As a result, the EIR did not meaningfully address feasible alternatives or mitigation measures.[7] Given the ample evidence that ESHA are present on Banning Ranch, the decision to forego discussion of these topics cannot be considered reasonable.

None of the City's justifications for deferring the ESHA analysis is persuasive. It contends it has no authority to designate ESHA on Banning Ranch because only the Coastal Commission can do that. Amicus curiae League of California Cities makes a similar argument that lead agencies are not required to make legal determinations within the province of another agency. The League expresses concern that ESHA identifications in EIRs might be subject to de novo judicial review. However, a lead agency is not required to make a "legal" ESHA determination in an EIR. Rather, it must discuss potential ESHA and their ramifications for mitigation measures and alternatives when there is credible evidence that ESHA might be present on a project site. A reviewing court considers only the sufficiency of the discussion.[8]

---

[7]    We express no view as to whether ESHA impacts must be avoided, as opposed to mitigated. (See *Bolsa Chica Land Trust v. Superior Court* (1999) 71 Cal.App.4th 493, 507.) The issue never arose here because the EIR did not discuss ESHA impacts. We use "mitigation" in a general sense, to include such measures as buffer zones.

[8]    BRC contends the City *did* have legal authority to designate ESHA, relying on *Douda v. California Coastal Com.* (2008) 159 Cal.App.4th 1181. *Douda* is inapposite; there the court reviewed a challenge to the *Coastal Commission's* authority to designate ESHA. (*Id*. at p. 1191.) In passing, the court noted that a local government may become an "issuing agency," i.e., an agency empowered to issue a coastal development permit, before it certifies a local coastal program. (*Id*. at pp. 1188, 1191.) For that to happen, however, the local agency must "establish procedures for the filing, processing, review, modification, approval, or denial of a coastal development permit." (§ 30600, subd. (b)(1).) The City had no such procedures in place.

*(footnote continued on next page)*

21

The City claims that identification of potential ESHA would be merely speculative. The argument fails for several reasons. First, no speculation was involved with respect to the two ESHA covered by the consent orders.[9] These areas were in the path of the Bluff Road access from West Coast Highway, yet the City approved the road without considering ESHA requirements. Further, the City knew that NBR's own biological consultant had identified numerous potential ESHA in other areas. The City's CLUP provided guidelines for identifying ESHA. The City was offered the assistance of Coastal Commission staff. It had ample bases for an informed discussion of the NBR project's potential ESHA impacts. "The fact that precision may not be possible . . . does not mean that no analysis is required. 'Drafting an EIR . . . involves some degree of forecasting. While foreseeing the unforeseeable is not possible, an agency must use its best efforts to find out and disclose all that it reasonably can.' (Guidelines, § 15144.)" (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 399.) Here the City did not use its best efforts to investigate and disclose what it discovered about ESHA on Banning Ranch.

---

*(footnote continued from previous page)*

The *Douda* court, in the course of summarizing the terms of section 30600, which are less than crystalline, suggested that a local agency might be authorized to issue permits without either certifying a local coastal program or following section 30600, subdivision (b)(1). (*Douda v. California Coastal Com.*, *supra*, 159 Cal.App.4th at p. 1188.) The suggestion is incorrect. The statute leaves no room for such a scenario. (§ 30600, subds. (c) & (d).)

[9] BRC asserts the City had earlier determined that *all* of Banning Ranch was ESHA. The claim is misleading. As the City explains, a study referenced in a 2003 planning document had generally identified Banning Ranch as "ESHA." After Coastal Commission staff cautioned the City about the consequences of designating ESHA under the Coastal Act, the City changed its usage to refer to Banning Ranch as an "environmental study area."

22

It also appears that the City has evaluated ESHA impacts as a matter of course for other projects. The EIR explained that even though it did not have a certified local coastal program and therefore could not issue coastal development permits, the City did review project applications for consistency with its general plan, zoning regulations, and CLUP. Applicants would then seek a coastal development permit from the Coastal Commission. Accordingly, it seems the City *routinely* applied its CLUP requirements, which include specific ESHA guidelines, even though ultimate ESHA determinations would be made by the commission. The City's excuse for not doing so in this case is that Banning Ranch is not covered by the CLUP. However, the EIR acknowledged that the commission would consider the CLUP's provisions when it assessed ESHA on Banning Ranch. Nothing prevented the City from doing the same, just as it does for projects within the CLUP.

The City insists that ESHA would be fully considered during the permitting phase of the project. Such a delay is inconsistent with CEQA's policy of integrated review. (§ 21003, subd. (a).) As noted, a lead agency must consider related regulations and matters of regional significance when weighing project alternatives. (Guidelines, § 15126.6.) The City's argument is also undermined by *Citizens for Quality Growth v. City of Mt. Shasta* (1988) 198 Cal.App.3d 433. There, the EIR did not discuss a mitigation measure proposed by the United States Army Corps of Engineers. The city justified the omission by claiming the corps would act to protect wetlands during the permit process. The court was not persuaded. "*Each* public agency is required to comply with CEQA and meet its responsibilities, including evaluating mitigation measures and project alternatives. (See Guidelines, § 15020.)" (*Citizens for Quality Growth*, at p. 442, fn. 8.) Lead agencies in particular must take a *comprehensive* view in an EIR. (§ 21002.1,

23

subd. (d); *Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1298-1299.)

The City's position finds no support in *Banning Ranch I*, *supra*, 211 Cal.App.4th 1209. In that case the City identified potential ESHA in Sunset Ridge Park and discussed mitigation measures. BRC argued that the Coastal Commission was likely to disagree but did not claim, as it does here, that the City had entirely failed to designate potential ESHA. The *Banning Ranch I* court concluded that the Sunset Ridge Park EIR "adequately flagged potential inconsistencies and addressed them in advance through proposed mitigation." (*Id.* at p. 1234.) Here, the Court of Appeal reasoned that the Banning Ranch EIR also "adequately flagged potential inconsistencies with the Coastal Act by emphasizing (1) that the Project was outside the scope of [the CLUP], and (2) that the Coastal Commission would determine whether ESHAs were affected by the Project." We disagree. Instead of flagging and addressing potential conflicts with Coastal Act provisions, the City avoided any mention of them.

Hanging over the City's briefing, and much of the Court of Appeal opinion, is the supposition that if the City were required to identify potential ESHA in the EIR, it would have to accept the ESHA designations and related measures proposed by commission staff. That is not the case. An EIR is an informational document, not a settlement agreement or a memorandum of understanding. The lead agency may disagree with the opinions of other agencies. (See *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 642-643; *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 625-626 (*California Native Plant*).) In order to serve the important purpose of providing other agencies and the public with an informed discussion of impacts, mitigation measures, and alternatives, an EIR must lay out any competing views put forward by the lead agency and other

24

interested agencies. (See § 21061; *Laurel Heights I*, *supra*, 47 Cal.3d at p. 391.) The Guidelines state that an EIR should identify "[a]reas of controversy known to the lead agency including issues raised by [other] agencies." (Guidelines, § 15123, subd. (b)(2).) "Disagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among the experts." (Guidelines, § 15151.) "[M]ajor environmental issues raised when the lead agency's position is at variance with recommendations and objections raised in the comments must be addressed in detail." (Guidelines, § 15088, subd. (c).)

The City correctly points out that the ultimate findings regarding ESHA on Banning Ranch will be made by the California Coastal Commissioners themselves, not commission staff. But both the commissioners and interested members of the public are entitled to understand the disagreements between commission staff and the City on the subject of ESHA. The requirement that the City spell out its differences with commission staff " 'helps [e]nsure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug. . . . [W]here comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. *There must be good faith, reasoned analysis in response*.' " (*People v. County of Kern* (1974) 39 Cal.App.3d 830, 841-842; accord, *Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 935 (*Concerned Citizens*).) Rather than sweep disagreements under the rug, the City must fairly present them in its EIR. It is then free to explain why it declined to accept commission staff suggestions.

Some information on ESHA and the disputes between the City and commission staff can be gleaned from a diligent search of the EIR appendices and

25

other elements of the administrative record.  However, such a fragmented presentation is inadequate.  Readers of an EIR should not be required to "ferret out an unreferenced discussion in [related material] . . . .  The data in an EIR must not only be sufficient in quantity, it must be presented in a manner calculated to adequately inform the public and decision makers, who may not be previously familiar with the details of the project.  '[I]nformation "scattered here and there in EIR appendices," or a report "buried in an appendix," is not a substitute for "a good faith reasoned analysis . . . ." ' " (*Vineyard*, *supra*, 40 Cal.4th at p. 442.) Here the City did not make a good faith attempt to analyze project alternatives and mitigation measures in light of applicable Coastal Act requirements.  It openly declared that it was omitting any consideration of potential ESHA from the EIR, and deferring that analysis to a subsequent permitting process.  The City's approach, if generally adopted, would permit lead agencies to perform truncated and siloed environmental review, leaving it to other responsible agencies to address related concerns seriatim.

For all the reasons stated above, the Banning Ranch EIR is insufficient. The City did provide a detailed biological analysis of project impacts, which may have been adequate were Banning Ranch not in the coastal zone.  But, however technically accurate the City's analysis might otherwise be, it fell short by failing to account for the Coastal Act's ESHA protections.  "The preparation and circulation of an EIR is more than a set of technical hurdles for agencies and developers to overcome.  The EIR's function is to ensure that government officials who decide to build or approve a project do so with a full understanding of the environmental consequences and, equally important, that the public is assured those consequences have been taken into account.  (*Laurel Heights I*, *supra*, 47 Cal.3d at pp. 391-392.)" (*Vineyard*, *supra*, 40 Cal.4th at p. 449; see *Concerned Citizens*, *supra*, 42 Cal.3d at pp. 935-936.)  The subject of ESHA on Banning

26

Ranch was raised early and often by City residents and Coastal Commission staff. The City owed them a reasoned response.

We note that the City's handling of the Banning Ranch EIR not only conflicted with its CEQA obligations, but also ignored the practical reality that the project must ultimately pass muster under the Coastal Act. As one court has observed, coordination between a lead agency and a permitting agency "serves the laudable purpose of minimizing the chance the City will approve the Project, only to have later permits for the Project denied . . . ." (*California Native Plant*, *supra*, 172 Cal.App.4th at p. 642.) Agreement between the agencies is not necessary, as we have discussed, but conflicts may be avoided or reduced by consultation in early stages.

B. *Reversal Is Required*

By certifying an inadequate EIR, the City abused its discretion. "[F]ailure to disclose information called for by CEQA may be prejudicial 'regardless of whether a different outcome would have resulted if the public agency had complied' with the law (§ 21005, subd. (a))." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463.) On the other hand, "there is no presumption that error is prejudicial." (§ 21005, subd. (b).) "Insubstantial or merely technical omissions are not grounds for relief. [Citation.] 'A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' " (*Neighbors for Smart Rail*, at p. 463; see *Sierra Club*, *supra*, 7 Cal.4th at pp. 1236-1237.)

Accordingly, reversal is not called for whenever an agency may have failed to integrate its CEQA review with other environmental review procedures "to the maximum feasible extent." (§ 21003, subd. (a).)[10] To be prejudicial, a failure to account for related regulations must substantially impair the EIR's informational function. Here, the City's failure to discuss ESHA requirements and impacts was neither insubstantial nor merely technical. The omission resulted in inadequate evaluation of project alternatives and mitigation measures. Information highly relevant to the Coastal Commission's permitting function was suppressed. The public was deprived of a full understanding of the environmental issues raised by the Banning Ranch project proposal.

BRC is entitled to relief on its CEQA claim. We express no view on the general plan issues discussed by the courts below.

---

[10] We note that whether such a criticism may fairly be leveled in the first place is a question calling for application of a rule of reason, similar to the rule governing review of an EIR's analysis of "feasible" project alternatives. (See *Goleta Valley*, *supra*, 52 Cal.3d at p. 565; Guidelines, § 15126.6, subd. (f)(1).) Other regulations may be complex. Their application may be uncertain. Practical difficulties with interagency coordination may arise at the EIR stage. Courts must be careful not to second-guess good faith efforts to coordinate environmental review.

28

## III. DISPOSITION

We reverse the Court of Appeal's judgment and remand for further proceedings consistent with the views expressed herein.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

Appendix



1

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Banning Ranch Conservancy v. City of Newport Beach

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 236 Cal.App.4th 1341
**Rehearing Granted**

_____

**Opinion No.** S227473
**Date Filed:** March 30, 2017

_____

**Court:** Superior
**County:** Orange
**Judge:** Robert Louis Becking, Temporary Judge*, Nancy Weiben Stock and Kim Garlin Dunning

_____

**Counsel:**

Leibold McClendon & Mann, John G. McClendon, Douglas M. Johnson and David H. Mann for Plaintiff and Appellant.

The Law Office of Julie M. Hamilton, Julie M. Hamilton and Leslie Gaunt for Friends of the Canyon as Amicus Curiae on behalf of Plaintiff and Appellant.

Law Offices of Stephan C. Volker, Stephan C. Volker, Alexis E. Krieg and Daniel P. Garrett-Steinman for North Coast Rivers Alliance as Amicus Curiae on behalf of Plaintiff and Appellant.

Lisa T. Belenky; Coast Law Group and Marco Gonzalez for Center for Biological Diversity, California Native Plant Society and Coastal Environmental Rights Foundation as Amici Curiae on behalf of Plaintiff and Appellant.

Aaron Harp, City Attorney, Leonie Mulvihill, Assistant City Attorney; Remy Moose Manley, Whitman F. Manley and Jennifer S. Holman for Defendants and Appellants.

Thomas Law Group and Tina Thomas for California Infill Builders Federation as Amicus Curiae on behalf of Defendants and Appellants.

Joshua P. Thompson and Christopher M. Kieser for Pacific Legal Foundation as Amicus Curiae on behalf of Defendants and Appellants.

The Sohagi Law Group, Margaret M. Sohagi, Nicole H. Gordon and R. Tyson Sohagi for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendants and Appellants.

Manatt, Phelps & Phillips, Susan K. Hori and Benjamin G. Shatz for Real Parties in Interest and Appellants.

Kamala D. Harris, Attorney General, John A. Saurenman, Assistant Attorney General, and Jamee Jordan Patterson, Deputy Attorney General, for California Coastal Commission as Amicus Curiae.

*Pursuant to California Constitution, Article VI, section 21.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John G. McClendon
Leibold McClendon & Mann
9841 Irvine Center Drive, Suite 230
Irvine, CA  92618
(949) 585-6300

Whitman F. Manley
Remy Moose Manley
555 Capitol Mall, Suite 800
Sacramento, CA  95814
(916) 443-2745

Benjamin G. Shatz
Manatt, Phelps & Phillips
695 Town Center Drive, 14th Floor
Costa Mesa, CA  92626
(714) 371-2500